# Federal Defenders
## OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

May 31, 2022

**Via ECF**

The Honorable Analisa Torres
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re:     **United States v. Edward Navedo**
         **21 Cr. 329 (AT)**

Dear Judge Torres,

Edward Navedo has suffered nearly his entire life from crippling addiction, painful physical dependence on opioids, and untreated mental health conditions. These afflictions have directly contributed to the conduct at issue in this case and Mr. Navedo's previous arrests and convictions. Mr. Navedo readily acknowledges that these challenges are not an excuse for his conduct, for which he is responsible and deeply remorseful. But Mr. Navedo is hopeful that, as part of his sentence in this case, he can receive the treatment and counseling that he desperately needs to manage his addiction and avoid future unlawful conduct.

In light of Mr. Navedo's history and characteristics, the sentences received by other defendants in this Circuit, District, and before this Court for comparable conduct, and the section 3553(a) factors, Mr. Navedo does not deserve a sentence anywhere near the draconian advisory Sentencing Guidelines range. Rather, in light of Mr. Navedo's tragic life story, his life-long substance abuse and mental health challenges, his unreserved remorse and acceptance of responsibility, and his deep resolve to overcome his addiction and live a productive, law-abiding life, a sentence of 24 months' imprisonment, to be followed by a lengthy term of supervised release, with the first 12 months served in inpatient substance abuse and mental health treatment, and subsequent outpatient treatment, would be a far more appropriate sentence—one which would advance all of the goals of sentencing, without being "greater than necessary."

## I.     Mr. Navedo's Personal History and Characteristics

It is impossible to tell the story of Edward Navedo's life separate from the substance abuse, addiction, and mental health conditions that have plagued him for nearly his entire life. These unfortunate circumstances merit compassion at sentencing. *See* 18 U.S.C. § 3553(a)(1);

**United States v. Edward Navedo**
**21 Cr. 329 (AT)**

*e.g.*, *United States v. Monge*, 17 Cr. 611 (AT) (S.D.N.Y. Aug. 22, 2019) (considering defendant's "struggles with drug addiction" under section 3553 in imposing sentence).

      A.    *Edward Navedo's Life-long Struggles with Addiction*

      Born in New York City in 1961 and raised in a loving household on the Lower East Side of Manhattan, Edward Navedo was the son of a seamstress and a laborer. (PSR ¶¶ 68, 71.) Edward would split his later adolescence between New York and Puerto Rico, where his family moved when he was approximately 15 years old and where he finished high school. (PSR ¶ 70.) Although he came from a hardworking, loving family, Edward was one of many casualties of the heroin wave that swept over the Lower East Side and Puerto Rico in the 1970s. *See, e.g.*, R. Curtis et al., Nat'l Inst. of Justice, *We Deliver: The Gentrification of Drug Markets on Manhattan's Lower East Side* (2002) (noting that, in the 1970s, the Lower East Side "was referred to as the 'drug capital of America' and the 'Mecca of dope [heroin]'" (citations omitted))[1]; Mason B. Williams, "How the Rockefeller Laws Hit the Streets: Drug Policing and the Politics of State Competence in New York City, 1973–1989," MODERN AMERICAN HISTORY 4, 79–80 (Cambridge Univ. Press 2021) (describing how, in the 1970s, in light of the deindustrialization and public finance crises hitting New York City, the Lower East Side drug trade "represented an 'integral part' of the neighborhood economy—as an industry, it was among the neighborhood's largest employers, particularly for young people (on the Lower East Side, predominantly Puerto Rican) hit hard by the disappearance of manufacturing and government jobs").

      Mr. Navedo's history of substance abuse, however, began even earlier than that. He began drinking alcohol when he was around 8 years old, and he has struggled with alcoholism and periods of excessive drinking since his youth. (PSR ¶ 78.) Although overtaken by stronger substances, Edward's difficulties with alcohol have remained, and during the time period at issue in this case, Mr. Navedo was drinking heavily, every day, nearly from the moment he woke up.

      Edward began using marijuana at around the age of 10, continuing throughout his youth and young adulthood. (PSR ¶ 78.) More powerful substances—including cocaine, hallucinogens, and prescription pills—followed, as a teenaged Edward fell further into drug addiction. This decline reached its seeming nadir when Mr. Navedo began using heroin around the age of 18, soon in combination with other controlled substances. (PSR ¶ 78.)

      The powerful hold that heroin took over Mr. Navedo (and too many of his friends and family) began to control his life. Soon, Edward—who had been able to graduate high school despite his growing substance abuse problems—became physically reliant on heroin to get through the day without painful, debilitating withdrawal symptoms. Mr. Navedo would be overcome with the compulsion to avoid these painful episodes and would seek to acquire and consume heroin by any means, including unlawful conduct. The all-consuming nature of his addiction and the damage it inflicted on Mr. Navedo and those around him also caused Mr.

---

[1]   https://www.ojp.gov/pdffiles1/nij/grants/197716.pdf

<u>United States v. Edward Navedo</u>
**21 Cr. 329 (AT)**

Navedo to lose contact with loved ones, including his now-adult daughter. (PSR ¶ 73.) Sadly, Mr. Navedo also lost his brother to complications from AIDS that his brother contracted in connection with his own heroin addiction. (PSR ¶ 69.)

B.      *The Relationship Between Mr. Navedo's Addiction, Mental Health Issues, and Unlawful Conduct*

To assist the undersigned in better understanding Mr. Navedo's addiction issues and how they relate to the conduct in this case, Dr. John J. Mariani, MD, conducted a forensic psychiatric evaluation of Mr. Navedo. (Ex. A.) Dr. Mariani is a Board Certified Addiction Psychiatrist, an Associate Professor of Clinical Psychiatry in the Department of Psychiatry, Division on Substance Use Disorders, at Columbia University Irving Medical Center, and the Director of the Substance Treatment and Research Service of Columbia University Irving Medical Center. Dr. Mariani interviewed Mr. Navedo, reviewed his recent and prior medical records, and evaluated him for any currently occurring substance abuse, psychological, or mental health disorders.

Dr. Mariani diagnosed Mr. Navedo with Opioid Use Disorder (Severe), Alcohol Use Disorder (Moderate Severity), and Major Depressive Disorder (Recurrent). (*Id.* at 9.) These diagnoses are consistent with Mr. Navedo's medical records from his time in substance abuse and mental health treatment at Phoenix House (a drug and alcohol treatment and rehabilitation provider) from 2013 through 2016, which reflect previous diagnoses for Opioid Use Disorder (Severe), Opioid Dependence, Alcohol Dependence, Major Depressive Disorder, and Generalized Anxiety Disorder.

In his report, Dr. Mariani explains that when long-time heroin users like Mr. Navedo consume opioids for a prolonged period of time, the body creates a state of physical dependence, which requires continual and increasing amounts of opioids in order to stave off the physiological effects of withdrawal. (*Id.* at 4–5.) The symptoms of opioid withdrawal can include "rapid heart rate, nausea, diarrhea, vomiting, tremor, muscle and joint pain, sweating, restless movements, anxiety, irritability, insomnia, loss of appetite, runny nose and eye tearing." (*Id.* at 5.) As Dr. Mariani noted, "an individual with Mr. Navedo's long history of opioid use . . . would be expected [to] experience severe opioid withdrawal symptoms upon ceasing ingestion of opioids. Indeed, Mr. Navedo's BOP medical records reflect that he experienced such symptoms upon his detention in this case." (*Id.*)[2]

Dr. Mariani describes how the physical compulsion to satiate the body's opioid dependence and prevent withdrawal symptoms frequently leads to unlawful conduct:

[I]t is the deep need to avoid developing withdrawal symptoms that often motivates criminal behavior. The mind of someone addicted to opioids is in a very

---

[2]    It was for this reason, and to get Mr. Navedo the medical treatment he needed, that the defense moved to have Mr. Navedo released from BOP custody to an inpatient treatment program in 2021. *See* Dkts. 11, 22, 29.

<u>United States v. Edward Navedo</u>
21 Cr. 329 (AT)

desperate state; not only does s/he crave the euphoria of drug use, there is also a physiological need to avoid the painful symptoms of withdrawal. It is this binary desperation that impairs judgment, and propels the conduct to obtain more opioids. . . . The fear of developing severe withdrawal symptoms motivates the dependent individual to engage in behavior to maintain a supply of heroin/fentanyl, regardless of the consequences. (*Id.*)

It is now widely recognized by leading health authorities that this physical dependence and "compulsive craving" for a controlled substance can significantly impair decision making and voluntary choice. *See* U.S. Dep't of Health and Human Services (HHS), Office of the Surgeon General, *Facing Addiction in America: The Surgeon General's Report on Alcohol, Drugs, and Health* at 2-1 (Nov. 2016) ("[S]evere substance use disorders, commonly called addictions, were once viewed largely as a moral failing or character flaw, but are now understood to be chronic illnesses characterized by clinically significant impairments in health, social function, and voluntary control over substance use.")[3]; A. I. Leshner, *Science-Based Views of Drug Addiction and Its Treatment*, 282 J. AM. MED. ASS'N 1314, 1314 (1999) ("While addiction was traditionally thought of as simply using a lot of drugs or as just physical dependence on a drug, advances in both science and clinical practice have revealed that what matters most in addiction is often an uncontrollable compulsion to seek and use drugs.").

Dr. Mariani notes that "Mr. Navedo reports symptoms consistent with a physical dependence on opioids," which "drive compulsive substance ingestion." (Ex. A at 9.) Specifically, Dr. Mariani describes how "[a]s [Mr. Navedo's] physical dependence on opioids intensified, the amount of heroin required to prevent developing withdrawal symptoms increased. This amount of opioid use led to a substantial degree of physical dependence on opioids, as demonstrated by his development of opioid withdrawal symptoms several hours after the last use of heroin." (*Id.* at 2.)

It is thus unsurprising that, as his heroin addiction was worsening beginning in the 1980s, Mr. Navedo was arrested for offenses that he committed in order to acquire the controlled substances (or the money to buy them) on which he had become physically dependent.[4] Mr. Navedo was also arrested for controlled substance offenses (or had his parole revoked for failing drug tests), demonstrating the overwhelming power of his opioid addiction and the inability of incarceration alone to remedy it.

Throughout this time period, Mr. Navedo's underlying mental health issues went largely untreated. (*See* PSR ¶ 76 (discussing Mr. Navedo's diagnosis of depression in late 1990s); Ex. A at 3.) The concept of co-occurring substance abuse and mental health disorders, and the study of comprehensive approaches to treating patients with such "dual diagnoses," did not emerge until the late 1980s. *See* R. Drake, M.D., Ph.D. & M. Wallach, Ph.D., *Dual Diagnosis: 15 Years of*

---

[3]   https://addiction.surgeongeneral.gov/sites/default/files/surgeon-generals-report.pdf

[4]   While Mr. Navedo has numerous prior arrests, it is noteworthy that, as the PSR confirms, his most serious convictions occurred several decades ago, when he was a much younger man.

*Progress*, 51 PSYCH. SERV. 1126, 1126–27 (Sept. 2000). In the 1990s, more research and data began to demonstrate "the links between substance use disorders and other negative outcomes for patients with dual diagnoses," reflecting that co-occurring mental health and substance abuse disorders frequently lead to relapse and recidivism. *Id.* at 1127. These data further established that traditional, separate mental health and substance abuse services for people with dual disorders were ineffective and that integrated treatment programs that combine mental health and substance abuse interventions offered the most promise for positive outcomes. *Id.* These data are corroborated by Mr. Navedo's marked improvement during his enrollment in comprehensive substance abuse and mental health programming at Phoenix House.

C.     *Mr. Navedo Responds Positively to Intensive, Medication-Assisted Substance Abuse and Mental Health Treatment*

The cycle of incarceration, addiction, relapse, and re-arrest that defined much of Mr. Navedo's adult life was broken for the first significant period of time in the 2010s, when Mr. Navedo was mandated to comprehensive substance abuse and mental health treatment at Phoenix House, first in a residential treatment setting, then on an outpatient basis. (Ex. A at 2.) Although Mr. Navedo had been ordered to attend substance abuse treatment programs previously, his time at Phoenix House was the first in which he received the full complement of services that his complex, dual substance abuse and mental health disorders demanded. (*Id.* at 3.)

As part of his treatment regimen at Phoenix House, Mr. Navedo received medication-assisted treatment for his opioid disorder; psychiatric medication for his depression and anxiety disorders; group and individual counseling sessions to help manage his conditions and avoid relapsing; and was provided a structured environment that directed his energies to productive activities. This comprehensive, intensive treatment for Mr. Navedo's dual substance abuse and mental health conditions produced notably positive outcomes for Mr. Navedo physically, mentally, and emotionally. (*Id.*) During and after this time, Mr. Navedo worked and helped provide for his mother in Puerto Rico and his long-time partner, Ivelys Gonzalez, who herself had struggled with and overcome addiction issues.

Not only was Mr. Navedo's life more stable and productive during this time than at any other point he can remember, but his sobriety and abstinence from opioids during this time also coincided with Mr. Navedo avoiding arrest or law enforcement interactions for a sustained period of time. In contrast to his frequent interactions with the criminal justice system from the 1980s through the early 2000s, prior to the instant case, Mr. Navedo had no arrests or criminal convictions since 2012. (*See* PSR at 16–17, 26.)

As Ms. Gonzalez reports, several years ago she was diagnosed with lung disease that made even simple tasks like walking the dog excruciating. Mr. Navedo took on the role as her full-time caretaker and home health aide, helping with everything from grocery shopping and paying the bills, to cooking meals and accompanying Ms. Gonzalez to her medical appointments. (Ex. C.) Ms. Gonzalez's family also reports that Mr. Navedo was deeply dedicated to caring for her and, despite his struggles, he was a devoted and loving member of their family. (Exs. D, E.)

United States v. Edward Navedo
21 Cr. 329 (AT)

Unfortunately, in light of the combination of Ms. Gonzalez's diagnosis and the stress it created for Mr. Navedo, and without the support system of the substance abuse and mental health programming he had been receiving (after he stopped attending when his mandated participation concluded), Mr. Navedo relapsed in the late 2010s. (Ex. A at 2.) His pronounced alcoholism and opioid addiction overcame him and, like far too many who struggle with opioid addiction, he resorted to the sale of controlled substances to help support his own addiction. That the period of Mr. Navedo's life that was defined by comprehensive treatment, lawful conduct, and relative calm came undone and led to tragedy in this case is heartbreaking.

## II.     The Offense Conduct

As he explained to the Court in his plea colloquy, in late 2019, in order to support his own purchases of heroin, Mr. Navedo sold what he believed was heroin on the Lower East Side of Manhattan. *See* Dkt. 39, Tr. 23:6–9. Telephone records reflect that on the morning of December 19, 2019, Mr. Luis Pereyra contacted Mr. Navedo. Later that day, Mr. Pereyra's roommate returned to their room to find Mr. Pereyra unconscious, with drug paraphernalia nearby. Mr. Pereyra was transported to the hospital, where he was pronounced deceased.

The subsequent medical examinations concluded that the primary cause of Mr. Pereyra's death was acute intoxication by the combined effects of fentanyl, heroin, gabapentin, and methadone. USAO_000348. The medical examinations further concluded that Mr. Pereyra suffered from preexisting cardiovascular disease, high blood pressure, obesity, and symptoms of long-term opioid usage. *Id.* The discovery reflects that Mr. Pereyra had earlier complained to his family members of chest pain and difficulty breathing. USAO_000364.

Mr. Navedo—who, in late 2019, was drinking excessive amounts of alcohol and consuming significant quantities of heroin daily (Ex. A at 1–3)—does not recall Mr. Pereyra or any interactions with him. Although the purchase by Mr. Pereyra of the substance he overdosed on was not captured or recorded, subsequent "controlled purchases" by uncover officers from Mr. Navedo reflect that the packaging of several of these purchases matched the packaging found near Mr. Pereyra at the time of his overdose.

Mr. Navedo never intended for any harm to befall Mr. Pereyra, who he did not know.[5] Nor did Mr. Navedo have any knowledge that Mr. Pereyra was particularly vulnerable to an opioid overdose due to his preexisting conditions. Mr. Navedo also did not know that, mixed in among the heroin he sold, was the much more powerful fentanyl. To the contrary, Mr. Navedo

---

[5]   Mr. Navedo did not even know Mr. Pereyra's name. The two only communicated briefly a handful of times on and around December 19, 2019, *see* USAO_0046337 (TextNow records), USAO_0002231–233 (Mr. Pereyra's phone records), USAO_0001400 (Mr. Navedo's phone records), and Mr. Navedo's phone number was not added to Mr. Pereyra's phone until December 19, 2019—the date of the transaction at issue in this case, *see* USAO_0004564. This is consistent with NYPD records, which reflect that Mr. Pereyra was a recently admitted resident of his rehabilitation facility in Lower Manhattan.

United States v. Edward Navedo
21 Cr. 329 (AT)

was contemporaneously using the same substances, unknowingly putting his own life at risk every time he used. Mr. Navedo did not know that Mr. Pereyra overdosed or died until he was informed of the charges against him in this case—a fact that devastated him when he learned it.

## III.   Mr. Navedo's Remorse, Guilt, and Shame

As reflected in this letter to the Court, Mr. Navedo is incredibly remorseful for his actions. (Ex. B.) He frequently breaks down crying when he meets with or speaks to members of his legal and social work teams. Indeed, as the Court may recall, Mr. Navedo sobbed throughout his guilty plea hearing. Mr. Navedo perseverates on how his conduct contributed to the death of Mr. Pereyra, and the crushing shame and regret he feels (in combination with his severe depression) frequently overwhelm him. Even in his forensic evaluation—which did not focus on the conduct at issue in this case—Dr. Mariani noted that Mr. Navedo was deeply remorseful. (Ex. A at 8.)

This sincere remorse regarding Mr. Pereyra is compounded by the grief Mr. Navedo feels for how his actions and incarceration have caused profound difficulties for his family, who depend on him and have supported him through his years of struggle. As Mr. Navedo's long-time partner Ms. Gonzalez reports, since Mr. Navedo's arrest and incarceration, Ms. Gonzalez has been on her own, struggling to make ends meet, pay the bills, and perform the simple day to day tasks that Mr. Navedo handled for her since the onset of her debilitating illness. (Ex. C.) It wounds Mr. Navedo deeply to know that his actions have caused Ms. Gonzalez to lose her primary support system as she ages and her illness progresses. (Ex. B.)

Similarly, Mr. Navedo's actions have deprived his elderly mother in Puerto Rico of her remaining child and a source of emotional support. (Ex. D.) At 85 years old and having lost her husband, Ms. Canman depended on Mr. Navedo not just for extra money, but for comfort and solace in her frequent solitude. Mr. Navedo tears up when the topic of his family comes up, as he is overcome with sorrow for the pain he has caused them.

To help process these interrelated feelings of remorse, guilt, and shame, and to help him understand how his conduct affected others, since his arrest, Mr. Navedo has worked extensively with social work professionals associated with the Federal Defenders of New York. These social work professionals describe how, during their meetings, Mr. Navedo has been deeply emotional and struggled with the harm his behaviors have caused—to Mr. Pereyra and his family, as well as to Mr. Navedo's mother and partner. (Ex. G.) The deep agony and pain Mr. Navedo feels for Mr. Pereyra's passing will remain with Mr. Navedo for the rest of his life, and coming to terms with his role in this death has been a focus of Mr. Navedo's social work sessions. (*Id.* at 2.)

## IV.   Mr. Navedo's Potential Positive Future

Mr. Navedo is not a lost cause. Dr. Mariani concluded that there are several "positive prognostic factors for Mr. Navedo," including "his insight into the negative consequences of his substance use and associated criminal behavior, his positive response to buprenorphine treatment at present, and his history of responding to intensive substance use disorder behavioral treatment

United States v. Edward Navedo
21 Cr. 329 (AT)

in the past." (Ex. A at 9.) As Mr. Navedo reports in his letter to the Court, since he began receiving opioid agonist injections, he does "not have the same cravings." (Ex. B.)

In addition, Dr. Mariani reports that Mr. Navedo is "able to examine his own behavior and the resultant consequences of his actions on his own life, as well as others close to him," and recognizes that he is "an aging man who cannot continue the cycle of substance use and incarceration." (Ex. A at 9.) Mr. Navedo's social work team similarly recounts that "Mr. Navedo has shown dedication towards leading a sober, law-abiding, and productive life. Mr. Navedo has expressed remorse and actively worked towards being accountable to himself, his family, and his community and he intends to continue this work once he is released." (Ex. G.) Mr. Navedo has pledged to engage with any program or other treatment he is ordered to attend. (Ex. B.)

The possibility that Mr. Navedo—if given the opportunity—can stabilize and live a productive, law-abiding life, abstinent from opioids and other controlled substances, is not hypothetical. As noted above and reflected in Mr. Navedo's criminal history, from 2012 to the instant offense, Mr. Navedo had no arrests or criminal prosecutions. During a significant portion of this time, Mr. Navedo was receiving comprehensive substance abuse and mental health treatment that largely stabilized him. Ms. Gonzalez reports that, in addition to staying out of legal trouble, Mr. Navedo was generally clean, sober, and maintained employment. (Ex. C.)

As Dr. Mariani has concluded that, with the appropriate support systems and treatment regimens, Mr. Navedo could return to and maintain such stability and avoid the relapses that have historically led to his unlawful conduct. Dr. Mariani explains:

Mr. Navedo's main risk for returning to criminal behavior is if he relapses to substance use. . . . High quality substance use disorder treatment of appropriate intensity and duration will be the most effective intervention to reduce the risk of Mr. Navedo relapsing to opioid use. Ongoing treatment for opioid use disorder and mood disorders is the most effective means of reducing relapse risk and recidivism. (Ex. A at 10.)

Specifically, Dr. Mariani recommends intensive behavioral treatment combined with medication that Mr. Navedo has started to receive:

To reduce the risk of relapse to opioid use disorder, Mr. Navedo will require continued treatment with buprenorphine, as well as intensive behavioral treatment. Alcohol use disorder treatment would be a component of any behavioral treatment program for opioid use disorder. I would recommend returning him to residential treatment at Phoenix House as he recently had a positive experience there. Residential treatment should be followed by a prolonged period of outpatient treatment and monitoring. A total period of residential and outpatient treatment of at least 5-years would be ideal. (*Id.* at 9.)

Dr. Mariani further recommends that, "[i]n order to achieve the best possible treatment outcome, both the substance use and mood disorders must be simultaneously treated. Phoenix

**United States v. Edward Navedo**
**21 Cr. 329 (AT)**

House, or a similar facility, would be able to manage the treatment of Mr. Navedo's co-occurring substance use and mood disorders." (*Id.*)

One of the primary motivating factors for Mr. Navedo's bail applications was his earnest desire (and physical need) to be evaluated, stabilized, and placed on a substance abuse and mental health treatment plan to address his physical dependence on opioids—the primary contributing factors to his criminal conduct. It remains Mr. Navedo's sincere hope that he be given the opportunity for comprehensive, intensive, and ongoing opioid addiction treatment and programming, to which he has responded positively. Mr. Navedo's family members all report that he has tried repeatedly to overcome his addiction and is committed to doing so with the proper professional attention. (Exs. C, D.) Ms. Gonzalez and her family have promised to provide any support they can to help Mr. Navedo through this difficult process. (Exs. C, E, F.)

V.      **Mr. Navedo's Arrest, Plea Agreement, Guilty Plea,**
        **and Advisory Guidelines Range**

Although the conduct at issue here took place in December 2019, Mr. Navedo was not arrested until May 2021. On January 11, 2022, Mr. Navedo pleaded guilty, pursuant to a plea agreement, to one violation of 21 U.S.C. § 841(b)(1)(C).

Under the terms of the plea agreement, Mr. Navedo's total offense level is 35 (after accounting for a three-level reduction for acceptance of responsibility), his criminal history category is III, and the applicable advisory Guidelines range is 210 to 240 months' imprisonment. As discussed below, this exorbitant Guidelines range is driven almost entirely by the fact that Mr. Pereyra died after consuming substances he purchased from Mr. Navedo.

The Probation Department correctly recognized that sentencing Mr. Navedo to nearly 20 years' imprisonment—an effective life sentence, given Mr. Navedo's age and health issues— would be disproportionate. Probation recommended a significant downward variance and a sentence of 120 months' incarceration, acknowledging that Mr. Navedo "suffers with depression and drug and alcohol abuse," and "prior to this arrest [Mr.] Navedo had not been convicted of a crime in over ten years." (PSR at 25–26.)

While we agree with the reasons for Probation's recommended downward variance, in light of Mr. Navedo's personal circumstances and the particular facts of this case, we respectfully submit that a sentence of 24 months' imprisonment, to be followed by supervised release (with the first year of supervision to be served in inpatient substance abuse and mental health treatment) and mandated substance abuse and mental health treatment would be far more effective in advancing the legitimate goals of sentencing, without being more punitive than necessary.

United States v. Edward Navedo
21 Cr. 329 (AT)

## VI.    The Appropriate Sentence Is No More Than 24 Months' Imprisonment Plus 12 Months of Inpatient Substance Abuse and Mental Health Treatment

### A.  *The Court Has Broad Discretion To Determine An Appropriate Sentence*

"A sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). In exercising this discretion, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)," which requires the Court to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)": "proportionality, deterrence, incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (quoting *United States v. Dorvee*, 616 F.3d 174, 183 (2d Cir. 2010)). In determining the appropriate sentence, the Court must consider these purposes, as well as the nature and circumstances of the offense, the history and characteristics of the defendant, the seriousness of the offense, the need to promote respect for the law, provide just punishment, deter criminal conduct, protect the public, provide the defendant with medical care in the most effective manner, and avoid unwarranted disparities. *See* 18 U.S.C. § 3553(a).

"[T]he Sentencing Guidelines are just that, guidelines, and . . . 'they truly are advisory.'" *Douglas*, 713 F.3d at 700 (quoting *Cavera*, 550 F.3d at 189). Rather than deferring to the Guidelines, the Court "must make an individualized assessment based on the facts presented" and "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Dorvee*, 616 F.3d at 182. In making this assessment, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487–88 (2011) (citations omitted).

### B.  *The Advisory Guidelines Range Drastically Overstates Mr. Navedo's Culpability*

The draconian advisory Guidelines range here, which suggests the imposition of a near-life sentence for Mr. Navedo, dramatically overstates Mr. Navedo's culpability and is driven almost entirely by an outcome—the tragic passing of Mr. Pereyra—that Mr. Navedo did not intend and did not seek to bring about.

Specifically, the base offense level of 38 produced by the Guidelines is unduly high and yields an advisory range that is greater than necessary to achieve the goals of sentencing. The Guidelines provide the same or lower base offense levels for conduct where the offender's culpability—i.e., the conduct the person engaged in—was far more serious than Mr. Navedo's, even if the outcome—i.e., the occurrence beyond Mr. Navedo's control—was not death. For example, to arrive at the same base offense level of 38 faced by Mr. Navedo, a drug trafficker would have to sell *more than 90 kilograms* of heroin or *more than 36 kilograms* of fentanyl. *See* U.S.S.G. § 2D1.1(c)(1). In this case, Mr. Navedo sold less than .004% of this amount of heroin and less than 0.013% of this amount of fentanyl, yet faces the same advisory Guidelines range because—while having no intent to harm Mr. Pereyra or knowledge that the substance he was selling (and using) contained fentanyl—a particularly vulnerable person with preexisting health conditions passed away.

<u>United States v. Edward Navedo</u>
**21 Cr. 329 (AT)**

If Mr. Navedo's advisory Guidelines range were based on the total amount of controlled substances that investigating officers purchased from Mr. Navedo, the applicable Guidelines range in this case would be a fraction of 210 to 240 months' incarceration. The "controlled purchases" of illicit substances the investigating officers made from Mr. Navedo in this case correspond to a Base Offense Level of 14 under the Sentencing Guidelines. *See* U.S.S.G. §§ 2D1.1(a)(5), 2D1.1(c) ("Drug Quantity Table") & Application Note 8(D) (reflecting a Base Offense Level of 14 for a "converted drug weight" for 3.918g of heroin and 4.95g of fentanyl).[6] After a two-level reduction for acceptance of responsibility for his conduct, using this approach, Mr. Navedo's total offense level would be 12. *See* U.S.S.G. § 3E1.1(a). In criminal history category III, Mr. Navedo's advisory Sentencing Guidelines range would be 15–21 months' incarceration—less than 1/10th of the advisory Guidelines range in this case.

While not at all minimizing the tragic outcome here or understating the wrongfulness of Mr. Navedo's conduct, we respectfully submit that a more than 10-fold increase in Mr. Navedo's advisory Guidelines range is unjustified in light of the facts of this case, the public policy response to the opioid crisis, the arbitrary and discriminatory application of "death resulting" charges and Guidelines enhancements, and the sentences imposed on other defendants accused of similar, if not more egregious, conduct by courts in this Circuit, this District, and by this Court.

C. *The Public Policies Regarding the Opioid Crisis Are Relevant to the Court's Analysis of an Appropriate Sentence in this Case*

As has become unfortunately common knowledge, overdose deaths from opioids have been occurring with ever-increasing frequency in the United States. The government's sentencing submission might focus on the widespread tragedy of the opioid epidemic to justify its expected recommendation of a significant prison term in this case.

But if lengthy prison terms (based on enhanced penalties for low-level opioid users suffering from addiction, like Mr. Navedo, who sold substances that another user overdosed on) actually advanced the goals of sentencing, this would be reflected in the data. Yet despite the increasing application of these enhancements in jurisdictions around the country, the number of overdoses sadly continues to rise.

In November 2017, the Drug Policy Alliance issued a comprehensive report on the law enforcement response to overdose deaths. *See* L. LaSalle, Drug Policy Alliance, *An Overdose Death Is Not Murder: Why Drug-Induced Homicide Laws Are Counterproductive and Inhumane* (Nov. 2017).[7] The report directly addresses the argument that drug-induced homicide laws and sentencing enhancements are "necessary to curb increasing rates of drug overdose deaths," and concludes that "there is not a shred of evidence that these laws are effective at reducing overdose

---

[6] These controlled substance amounts are taken from the laboratory reports the government produced in this case. *See* USAO_000270, 284, 291, 297, 303, 310, 317, 324, 331, 338.

[7] http://www.drugpolicy.org/sites/default/files/dpa_drug_induced_homicide_report_0.pdf

<u>United States v. Edward Navedo</u>
21 Cr. 329 (AT)

fatalities. In fact, death tolls continue to climb across the country, even in the states and counties most aggressively prosecuting drug-induced homicide cases." *Id.* at 2. The report explains:

> Though the stated rationale of prosecutors and legislators throughout the country is that harsh penalties like those associated with drug-induced homicide laws will deter drug selling, and, as a result, will reduce drug use and related harms like overdose, we have heard this story before. Drug war proponents have been repeating the deterrence mantra for over 40 years, and yet drugs are cheaper, stronger, and more widely available than at any other time in US history. Supply follows demand, so the supply chain for illegal substances is not eliminated because a single seller is incarcerated, whether for drug-induced homicide or otherwise. Rather, the only effect of imprisoning a drug seller is to open the market for another one. Research consistently shows that neither increased arrests nor increased severity of criminal punishment for drug law violations results in less use (demand) or sales (supply). In other words, punitive sentences for drug offenses have no deterrent effect. *Id.*

This is corroborated by alarming Centers for Disease Control and Prevention (CDC) data, which reflect that overdose deaths have continued to rise. *See* CDC, "U.S. Overdose Deaths in 2021 Increased Half as Much as in 2020 – But Are Still Up 15%" (May 11, 2022).[8] This is so despite the fact that death-resulting and drug-induced homicide laws and penalties have been invoked with increasing frequency by law enforcement and prosecutors. *See* K.S. Phillips, *From Overdose to Crime Scene: The Incompatibility of Drug-induced Homicide Statutes with Due Process*, 70 Duke L. J. 659, 673 (2020). In fact, such policies might actually *increase* the number of fatal overdoses because in many cases, people are afraid to call for help when a friend overdoses, lest they be charged with a death-resulting offense. *See* LaSalle, *supra*, at 40.

The lack of a deterrent effect from harsh drug-induced death statutes and penalties is consistent with their over application to users struggling with addiction—people whose decision-making is defined not by rational choices influenced by potential legal penalties, but by their addiction, i.e., their "chronic, relapsing disorder characterized by compulsive drug seeking and use *despite* adverse consequences." U.S. Dep't of Health and Human Services (HHS), Nat'l Inst. on Drug Abuse, *Drugs, Brains, and Behavior: The Science of Addiction* at 4 (June 2020).[9]

As one scholar summarized, "the application of a harsh sentence for an action considered by most to be a minor offense violates the principle of proportionality. Surely, the death of any person is tragic. Singling out friends, dealers, or doctors who may have contributed to that fatality is both unfair and arbitrary, resulting in misplaced blame that muddles effective remedial action." L. Beletsky, *America's Favorite Antidote: Drug-Induced Homicide in the Age of the Overdose Crisis*, 2019 UTAH L. REV. 833, 880 (2019). Concerns about the misapplication of

---

[8]   https://www.cdc.gov/nchs/pressroom/nchs_press_releases/2022/202205.htm (last visited May 27, 2022)

[9]   https://nida.nih.gov/sites/default/files/soa.pdf

United States v. Edward Navedo
21 Cr. 329 (AT)

drug-induced homicide laws and sentencing enhancements are particularly acute because these provisions—which are "intended to penalize drug 'kingpins' by providing strict punishments to deter 'the most culpable and dangerous' drug dealers"—are more frequently applied to low-level dealers or users struggling with addiction, like Mr. Navedo. *See Phillips, supra,* at 663–64 (quoting N.J. Stat. Ann. § 2C:35-1.1). This is the case despite the fact that drug-induced homicide laws (and the sentencing enhancement at issue here) require no intent toward the death itself. *Id.*

But such application is not just arbitrary; the selective imposition of such dramatic penalties perpetuates the racial disparities inherent in the criminal justice system. Dr. Carl L. Hart, Chairman of the Psychology Department at Columbia University and a leading expert on national drug policy, has written that

> [m]ore than 80 percent of those convicted of heroin trafficking are black or Latino, although all racial groups buy and sell drugs at roughly the same rate. This is largely because of the discretionary nature of drug law enforcement, which continues to focus mostly on black and Latino communities. C.L. Hart, *The Real Opioid Emergency*, N.Y. TIMES (Aug. 18, 2017).[10]

It is well-established that "[e]nforcement of drug war policies has historically targeted black and Latino communities, and drug-induced homicide prosecutions appear to follow this pattern." LaSalle, *supra,* at 2. Indeed, "[a] recent analysis of federal fentanyl sentencing revealed that 75% of all individuals sentenced for fentanyl trafficking were people of color, suggesting that fentanyl enforcement already mirrors other disparate drug enforcement." Michael Collins & Sheila P. Vakharia, Drug Policy Alliance, *Criminal Justice Reform in the Fentanyl Era: One Step Forward, Two Steps Back* at 2 (Jan. 2020).[11]

> [T]hese findings suggest that drug-induced homicide charges are being selectively and disproportionately deployed to target people of color. This disparate application can further reinforce already dire racial disparities, particularly in the enforcement of drug laws and the length of sentencing for drug-related crimes. This is especially notable, given that findings reflect sentencing for people of color to be more than two years longer, on average, than for whites. Beletsky, *supra,* at 874.

In considering the appropriate sentence to impose on an aging Latino man with life-long addiction struggles, who sold small amounts of controlled substances to support his own opioid addiction, the Court should consider the broader context of this prosecution, and whether the imposition of increasingly harsh penalties will only exacerbate societal and systematic criminal justice problems, while having no discernible positive impact on the opioid crisis.

---

[10]   https://www.nytimes.com/2017/08/18/opinion/sunday/opioids-drugs-race-treatment.html (last visited May 27, 2022).

[11]   https://drugpolicy.org/sites/default/files/dpa-cj-reform-fentanyl-era-v.3_0.pdf

<u>United States v. Edward Navedo</u>
**21 Cr. 329 (AT)**

    D.   *Similarly Situated Defendants Have Received Significantly Shorter Sentences than*
        *Mr. Navedo's Guidelines Range for Similar, if Not More Culpable, Conduct*

       The arbitrary and discriminatory application of the "death-resulting" charges and sentencing enhancements counsels in favor of a significant downward variance in this case. Moreover, sentencing Mr. Navedo within the advisory Guidelines range here would needlessly exacerbate unwarranted sentencing disparities with other defendants accused of similar conduct, in contravention of section 3553(a)(6).

       Numerous courts in this District, as recently as last week, have imposed significantly lower sentences on defendants accused of conduct similar to that for which Mr. Navedo pleaded guilty. For example:

- *United States v. Morgan*, 14 Cr. 582 (ER) (S.D.N.Y.): in a case where the government "consistently and repeatedly advised the defendant and the Court of its position: that the Molly that the defendant sold was the Molly that caused [victim's] death," the defendant, a 24-year old white man, who the government contended "was a drug dealer who sold Molly that he knew would be used by the victim . . ., Molly that caused [the victim's] tragic death," was sentenced to eight months of home confinement, three years of supervised release, and 500 hours of community service. Notably, the government acknowledged that the defendant's sale of drugs that he himself used (as in this case) reflected that the defendant did not intend for the victim to overdose and die. *See* Dkt. 24 at 5 & n.7.

- *United States v. Figueras*, 17 Cr. 379 (JPO) (S.D.N.Y.): in a case where the government alleged that the defendant sold fentanyl-laced heroin that helped cause the death of the victim, *see* Dkt. 1 ¶ 14, as well as other controlled substances, the defendant was sentenced to 18 months' incarceration.

- *United States v. Travis*, 20 Cr. 192 (JPO) (S.D.N.Y.): in case where the government argued that the defendant supplied the "fatal fentanyl pills" that caused the death of the decedent, Dkt. 86 at 1, and the defendant's advisory Guidelines range was 188 to 236 months' incarceration (based on the "death-resulting" Guidelines enhancement), the court imposed a sentence of 12 months' imprisonment.

       The same is true elsewhere within the Second Circuit. The U.S. Attorney's Office for the District of Connecticut has launched an "initiative targeting narcotics dealers who distribute heroin, fentanyl or opioids that cause death or serious injury to users." U.S. Dep't of Justice, "Statewide Initiative Targets Distributors of Heroin and Opioids that Cause Overdose Deaths" (Apr. 13, 2016).[12] As part of this initiative, the Department of Justice has brought numerous federal prosecutions against persons who provided controlled opioids to users who died from the use of such substances. None were charged with "death-resulting" offenses or required to

---

[12]  https://www.justice.gov/usao-ct/pr/statewide-initiative-targets-distributors-heroin-and-opioids-cause-overdose-deaths (last visited May 27, 2022).

<u>United States v. Edward Navedo</u>
**21 Cr. 329 (AT)**

stipulate to the "death-resulting" sentencing enhancement. As a result, the sentences that these defendants received were a fraction of the advisory Guidelines range in this case. Mr. Navedo should not be punished exponentially more harshly than similarly situated defendants in this Circuit just because he was prosecuted 30 miles south of the District of Connecticut. For example:

- *United States v. Carrillo*, 17 Cr. 15 (AVC) (D. Conn.): defendant who the government argued sold heroin that killed victim received a sentence of six months' incarceration.[13]

- *United States v. Esposito*, 16 Cr. 209 (AVC) (D. Conn.): defendant who the government argued sold heroin that resulted in overdose death received a sentence of six months' incarceration.[14]

- *United States v. Jelliffe*, 16 Cr. 138 (JCH) (D. Conn.): defendant who the government argued sold heroin that resulted in overdose death received a sentence of one year and one day of incarceration.[15]

- *United States v. Fogler*, 16 Cr. 76 (JCH) (D. Conn.): defendant who the government argued sold heroin that resulted in overdose death received a sentence of one year and one day of incarceration.[16]

- *United States v. Delgado*, 16 Cr. 191 (VAB) (D. Conn.): defendant who the government argued sold heroin mixed with fentanyl that resulted in overdose death received a sentence of five months of incarceration.[17]

---

[13] U.S. Dep't of Justice, "Wethersfield Man Sentenced to Prison for Distributing Heroin Involved in 19-Year-Old's Overdose Death" (May 22, 2017), *available at* https://www.justice.gov/usao-ct/pr/wethersfield-man-sentenced-prison-distributing-heroin-involved-19-year-olds-overdose

[14] U.S. Dep't of Justice, "Wallingford Woman Sentenced to Prison for Distributing Heroin to Overdose Victim" (Jan. 25, 2017), *available at* https://www.justice.gov/usao-ct/pr/wallingford-woman-sentenced-prison-distributing-heroin-overdose-victim

[15] U.S. Dep't of Justice, "West Haven Woman Sentenced to Federal Prison for Distributing Heroin Involved in Overdose Death" (Oct. 11, 2016), *available at* https://www.justice.gov/usao-ct/pr/west-haven-woman-sentenced-federal-prison-distributing-heroin-involved-overdose-death

[16] U.S. Dep't of Justice, "West Haven Man Sentenced to Federal Prison for Distributing Heroin Involved in Overdose Death" (July 19, 2016), *available at* https://www.justice.gov/usao-ct/pr/west-haven-man-sentenced-federal-prison-distributing-heroin-involved-overdose-death

[17] U.S. Dep't of Justice, "Bridgeport Man Sentenced to Prison for Distributing Heroin" (Nov. 29, 2017), *available at* https://www.justice.gov/usao-ct/pr/bridgeport-man-sentenced-prison-distributing-heroin

**United States v. Edward Navedo**
**21 Cr. 329 (AT)**

- *United States v. Delgado*, 16 Cr. 192 (VAB) (D. Conn.): defendant who the government argued sold heroin mixed with fentanyl that resulted in overdose death received a sentence of 13 months' incarceration.[18]

- *United States v. Johnson*, 17 Cr. 63 (AWT) (D. Conn.): defendant who the government argued sold heroin and fentanyl that resulted in overdose death received a sentence of 13 months' incarceration.[19]

- *United States v. Vibbert*, 17 Cr. 183 (VMT) (D. Conn.): defendant who the government argued sold heroin and fentanyl that resulted in overdose death received a sentence of one year and one day of incarceration.[20]

- *United States v. Maldonado*, 16 Cr. 116 (PRU) (D. Conn.): defendant who the government alleged sold PCP mixed with fentanyl that resulted in overdose death received a sentence of one year and one day of incarceration.[21]

- *United States v. Kinney*, 17 Cr. 226 (VAB) (D. Conn.): defendant who the government argued sold heroin and fentanyl that resulted in overdose death received sentence of 30 months' incarceration, despite defendant being arrested with 40 bags of heroin and 150 bags of fentanyl, which had identical labeling to the bags found at the decedent's hotel.[22]

- *United States v. Fisher*, 16 Cr. 79 (VLB) (D. Conn.): defendant who the government argued sold heroin and fentanyl that resulted in overdose death received sentence of 30 months'

---

[18] U.S. Dep't of Justice, "Bridgeport Man Sentenced to Prison for Distributing Fentanyl-Laced Heroin to Overdose Victims" (Jan. 26, 2017), *available at* https://www.justice.gov/usao-ct/pr/bridgeport-man-sentenced-prison-distributing-fentanyl-laced-heroin-overdose-victims

[19] U.S. Dep't of Justice, "Bridgeport Man Sentenced to Prison for Distributing Heroin That Led to Overdose in Monroe" (Dec. 6, 2017), *available at* https://www.justice.gov/usao-ct/pr/bridgeport-man-sentenced-prison-distributing-heroin-led-overdose-monroe s

[20] U.S. Dep't of Justice, "Fairfield Man Who Sold Heroin and Fentanyl to Deep River Overdose Victim Sentenced to Prison" (Jan. 30, 2018), *available at* https://www.justice.gov/usao-ct/pr/fairfield-man-who-sold-heroin-and-fentanyl-deep-river-overdose-victim-sentenced-prison

[21] U.S. Dep't of Justice, "West Hartford Man Sentenced to Prison for Distributing Fentanyl and PCP to Overdose Victim" (Jan. 18, 2018), *available at* https://www.justice.gov/usao-ct/pr/west-hartford-man-sentenced-prison-distributing-fentanyl-and-pcp-overdose-victim

[22] U.S. Dep't of Justice, "Plainfield Man Sentenced to 30 Months in Federal Prison for Distributing Fentanyl to Overdose Victim" (Jan. 12, 2018), *available at* https://www.justice.gov/usao-ct/pr/plainfield-man-sentenced-30-months-federal-prison-distributing-fentanyl-overdose-victim.

United States v. Edward Navedo
21 Cr. 329 (AT)

incarceration, despite being arrested with 300 bags of heroin, prescription narcotics, more than one pound of marijuana, a digital scale, and hundreds of empty glassine bags marked with the same stamp as that on the bags found with the decedent.[23]

Even in cases where the defendant knowingly continued to sell controlled substances despite knowing that someone had died from an overdose of that substance—far more egregious conduct than that presented here, where there is no evidence that Mr. Navedo had any knowledge that Mr. Pereyra overdosed—defendants in this District and Circuit have received sentences far below the Guidelines range Mr. Navedo faces here. For example:

- *United States v. Delosangeles*, 16 Cr. 634 (KMK) (S.D.N.Y.): defendant was convicted of violating 21 U.S.C. § 841(b)(1)(B), found to have sold the heroin that "substantially contributed" to the victim's overdose death, and had continued selling the same heroin after being told multiple times that someone he had sold heroin to had died from an overdose. *See* Dkt. 9 at 2–3. The defendant received a sentence of 84 months' incarceration.

- *United States v. Commerford*, 16 Cr. 89 (AWT) (D. Conn.): defendant was convicted of distributing heroin, including to a 16-year old customer, in violation of 21 U.S.C. §§ 841(a)(1) and 859, and the government argued that he continued to sell heroin he knew was tainted after he knew it caused an overdose death.[24] The defendant received a sentence of 71 months' incarceration.

- *United States v. Pina*, 16 Cr. 150 (MPS) (D. Conn.): defendant was convicted of distributing cocaine laced with fentanyl, which the government argued caused the deaths of three people, after the defendant himself overdosed on substance and knew it was tainted.[25] The defendant was sentenced to 87 months' incarceration.

The same is true of defendants who have been sentenced by this Court for knowing, intentional distribution of large quantities of opioids for personal financial profit—much more culpable conduct than that engaged in by Mr. Navedo:

---

[23]  U.S. Dep't of Justice, "Overdose Investigation Results in 30-Month Sentence for Norwich Man" (Dec. 14, 2016), *available at* https://www.justice.gov/usao-ct/pr/overdose-investigation-results-30-month-sentence-norwich-man.

[24]  U.S. Dep't of Justice, "Derby Man Connected to Overdose Death Sentenced to 71 Months in Federal Prison" (Aug. 12, 2016), *available at* https://www.justice.gov/usao-ct/pr/derby-man-connected-overdose-death-sentenced-71-months-federal-prison

[25]  U.S. Dep't of Justice, "New Haven Man Sentenced to 87 Months for Distributing Fentanyl-Laced Cocaine Involved in Spate of Overdoses" (Nov. 29, 2016), *available at* https://www.justice.gov/usao-ct/pr/new-haven-man-sentenced-87-months-distributing-fentanyl-laced-cocaine-involved-spate

<u>United States v. Edward Navedo</u>
**21 Cr. 329 (AT)**

- *United States v. Kalaba*, 13 Cr. 794 (AT) (S.D.N.Y.): defendant received an 84-month sentence for role as a leader of a multi-year and multi-million dollar oxycodone distribution scheme in violation of, *inter alia*, 21 U.S.C. § 841(b)(1)(C), which involved using multiple mail-order pharmacies to illegally obtain and distribute massive quantities of highly addictive opioids to customers who paid in cash and/or submitted prescriptions that reflected drug diversion—i.e., to feed addiction, not treat pain. The defendant oversaw a widespread operation involving multiple participants to conceal the illegal scheme, lie to authorities, and evade scrutiny. The defendant's sentence reflected a more than 84% downward variance from the advisory Guidelines sentence of 540 months' incarceration.

- *United States v. Wiseberg*, 13 Cr. 794 (AT) (S.D.N.Y.): defendant received an 84-month sentence for role as co-leader of massive, multi-million dollar illegal opioid distribution scheme described *supra*. The defendant's sentence reflected a more than 83% downward variance from the advisory Guidelines sentence of 528 months' incarceration.

Without minimizing the tragic outcome that Mr. Navedo's conduct helped bring about, we respectfully submit that his actions—which were motivated by an addiction and physical dependence on opioids—are much less culpable than the systematic, widespread distribution of opioids for personal financial gain and the severity of his sentence should reflect this fact.

This is to say nothing of the fact that many of those who have profited the most from the industrial production, mass marketing, and distribution of opioids—with the knowledge that these substances were being widely abused and were causing a burgeoning crisis of addiction— have entirely avoided criminal punishment. *See generally In re Purdue Pharma, L.P.*, 635 B.R. 26, 38–68 (S.D.N.Y. 2021) (describing the development of OxyContin, the deceptive marketing and widespread distribution of OxyContin, the concomitant rise in opioid addiction and overdose rates across the country, the transfer of billions of dollars from Purdue Pharma to the Sackler family as regulatory and litigation scrutiny of the company's practices increased, the release of all personal civil liability for members of the Sackler family as part of global resolution of pending federal and state investigations and bankruptcy proceeding, and the civil and criminal settlements reached, which did not result in the federal prosecution of any senior Purdue executive).

Because the "death-resulting" sentencing enhancement punishes Mr. Navedo exponentially more severely than defendants who engaged in similar, if not much more culpable, conduct, the advisory Guidelines range it produces is unreasonable, and the Court should decline to follow this range.

E. *Mr. Navedo's Past Offenses Related to His Addiction Overstate His Criminal History*

As is apparent from the nature of his prior convictions, Mr. Navedo's prior offenses are all directly related to his addiction and unlawful conduct he would engage in satiate his unbearable physical cravings for opioids. Courts around the country have recognized that criminal history categories predicated on such offenses overstate the seriousness of the defendant's record. *See, e.g.*, *United States v. Dickmann*, 06 Cr. 82 (LA), 2007 WL 442397, at *2

(E.D. Wis. Feb. 6, 2007) (imposing a non-Guideline sentence where defendant's prior convictions were "non-violent, possession and petty theft cases typical of an addict's attempt to get money to buy drugs"); *United States v. Wilkerson*, 183 F. Supp. 2d 373, 381 (D. Mass. 2002) (downwardly departing where the defendant's prior convictions were mostly drug and motor vehicle offenses); *United States v. Wilkes*, 130 F. Supp. 2d 222, 239–40 (D. Mass. 2001) (downwardly departing where the defendant's prior convictions were largely drug offenses); *United States v. Hammond*, 37 F. Supp. 2d 204, 205 (E.D.N.Y. 1999) (downwardly departing where the defendant's "prior arrests resulted from minor drug crimes involving facilitation of the sale of drugs and the kind of petty criminality associated with a poor addict's attempt to acquire money for the purchase of narcotics").

As Probation recognized, prior to the instant offense, Mr. Navedo had not been convicted of a crime for more than ten years, and his last felony conviction was more than 16 years ago. (PSR at 26.) We believe Mr. Navedo's criminal history score thus overstates his criminal history and improperly inflates his advisory Guidelines range.

F.   *The Guidelines Overstate Mr. Navedo's Risk of Recidivism*

Nor is an unduly long sentence necessary here to reduce the risk of recidivism in the future. To the contrary, Sentencing Commission data regarding heroin-related offenses (the most analogous offense to the conduct at issue here) confirm that older defendants convicted of opioid-related offenses, like Mr. Navedo, present a reduced risk of recidivism.

As an initial matter, the Sentencing Commission has concluded that "[o]lder offenders [are] substantially less likely than younger offenders to recidivate following release." U.S. Sent'g Comm'n, *The Effects of Aging on Recidivism Among Federal Offenders*, at 3 (2017).[26] Sentencing Commission data confirm that controlled substance-related defendants like Mr. Navedo who were more than 60 years old at the time of release presented by far the lowest risk of recidivism in terms of rearrest, reincarceration, and reconviction. *Id.* at 23.

### Recidivism Rates of Recidivism Study Offenders by Primary Offense Type and Age at Release

|  | N | Rearrest % | Reconviction % | Reincarceration % |
|---|---|---|---|---|
| Total | 25,386 | 49.3% | 31.7% | 24.7% |
|  | * | * | * |  |
| 60 Years of Age or Older |  | % | % | % |
| Primary Offense Type |  |  |  |  |
| Drug Trafficking | 286 | 17.5% | 10.1% | 6.6% |
| Firearms | 96 | 30.2% | 20.8% | 15.6% |
| Fraud | 297 | 12.5% | 6.7% | 4.7% |
| Robbery | 29 | 34.5% | 13.8% | 13.8% |
| All Other | 496 | 14.5% | 7.7% | 5.9% |

---

[26]   https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf

**United States v. Edward Navedo**
**21 Cr. 329 (AT)**

Sentencing Commission data demonstrate that, for heroin-related offenders specifically, "[t]he relationship between the sentence imposed and the sentencing guideline range had little impact on the recidivism rate." U.S. Sent'g Comm'n, *Recidivism Among Federal Drug Trafficking Offenders*, at 60 (2017).[27] In fact, the data show that heroin-related offenders "who received a non-government sponsored below-range sentence recidivated at a lower rate" than those who received Guidelines sentences. *Id.* Commission data further reflect that "[t]here is little to no association between the length of a heroin offender's original federal sentence and rate of recidivism, particularly when examining sentences of at least one year." *Id.* at 61.

Most notably for present purposes are the Sentencing Commission's conclusions that "[r]ecidivism rates among heroin offenders generally declined as their age at sentencing increased," and that "[a]ge at release was also associated with a lower risk of recidivism." *Id.* at 62. Specifically, the Sentencing Commission data demonstrate that heroin offenders who—like Mr. Navedo—were more than 60 years old at the time of sentencing and release had a drastically reduced recidivism rate. *Id.* As the Commission noted, although the data were limited, only 10.5% of heroin-related offenders who were older than 60 at the time of release were rearrested.



Figure 5.15
Rearrest Rates for Heroin Trafficking Offenders by Age at Sentencing & Release

For all these reasons, Mr. Navedo—who will be more than 60 years old at the time of his release—presents a much lower risk of recidivism than his advisory Guidelines range would suggest, particularly if mandated to participate in the type of treatment and counseling that has given him the structure to have long periods of law-abiding behavior in the past. A drastic term of imprisonment would be both unnecessary and counterproductive.

G. *The Purposes of a Criminal Sentence Would Not Be Served by Incarceration for More than 24 Months*

Each of the Section 3553(a)(2) sentencing factors supports imposing a sentence of no more than 24 months' imprisonment, to be followed by mandated inpatient substance abuse and

---

[27]   https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20170221_Recidivism-Drugs.pdf

mental health treatment. As the Second Circuit has explained, if the District Court believes a lesser period of incarceration will be as effective as a higher sentence in serving the purposes of sentencing, it must impose the lower sentence. *See United States v. Ministro-Tapia*, 470 F.3d 137, 142 (2d Cir. 2006) (holding that when a Guidelines sentence is "in equipoise with [a] below-the-range sentence," the parsimony clause of section 3553(a) requires the imposition of the lower sentence).

As reflected in his enclosed letter to the Court, Mr. Navedo accepts responsibility and is deeply remorse for his conduct. (Ex. B.) A sentence of no more than 24 months' imprisonment, with an additional year of inpatient substance abuse and mental health treatment would reflect the seriousness of the offense, would promote respect for the law, and would provide just punishment for the actions Mr. Navedo took. *See* 18 U.S.C. § 3553(a)(2)(A).

Such a sentence would also promote deterrence to the extent possible. *See id.* § 3553(a)(2)(B). Three National Academy of Sciences panels have concluded, and empirical data (such as those described above) have demonstrated, that "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." M. Tonry, Purposes and Functions of Sentencing, 34 CRIME & JUST. 1, 28 (2006). To the extent general deterrence can be advanced by punishing individual users with drug addiction issues, *see supra*, Mr. Navedo is already an example to others of the high likelihood of apprehension for drug sales like the ones at issue here, and a sentence exceeding 24 months, with an additional year of inpatient substance abuse treatment, is unnecessary to further advance this goal.

With respect to specific deterrence, as explained in the enclosed letter to the Court, Mr. Navedo will bear with him for the rest of his life the pain and anguish that his conduct contributed to the death of another person. (Ex. B.) The overwhelming sense of grief, shame, embarrassment, and sorrow that he feels for that conduct is more painful and specifically deterring than any term of imprisonment would be. Moreover, every day Mr. Navedo experiences searing pain knowing that his arrest, conviction, and incarceration have inflicted suffering on his loved ones, who relied on him to care for them as they deal with old age, isolation, and illness. (*Id.*) He is committed to a future life that involves substantial support and professional treatment, prolonged sobriety, and productive, prosocial conduct in the community.

H. *Mr. Navedo's Physical and Mental Health Issues Merit A Downward Variance*

Mr. Navedo's severe depression and interrelated addiction issues are relevant mitigating factors under section 3553(a) that weigh against a lengthy prison term. *See, e.g.*, *United States v. Ramos*, 18 Cr. 852 (AT) (S.D.N.Y.), Sent. Tr. 12:9–11 (accounting for defendant's mental health conditions, including depression, in imposing sentence).

Section 3553(a)(2)(D)—which requires the Court to consider how to provide the defendant with needed medical care or other treatment "in the most effective manner"—specifically weighs against the imposition of an unduly long period of incarceration. Mr. Navedo first and foremost needs comprehensive, substantial treatment for his co-occurring substance abuse and mental health issues. These afflictions are at the core of Mr. Navedo's interactions

<u>United States v. Edward Navedo</u>
21 Cr. 329 (AT)

with the criminal justice system, and as Dr. Mariani concluded (Ex. A at 9), intensive treatment would be (and has proven to be) the most constructive intervention to reduce Mr. Navedo's risk of recidivism and help Mr. Navedo lead a productive, law-abiding life.

While Mr. Navedo may have access to limited substance abuse and mental health treatment and programming while detained, due to budgetary, staffing, overcrowding, and core competency issues, the Bureau of Prisons (BOP) is unequipped and unable to provide Mr. Navedo with the sustained, comprehensive mental health and substance abuse treatment that he needs, let alone "in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Mr. Navedo will only be able to truly receive the comprehensive care he requires outside a carceral facility. *See* Ex. A; *see also* K. Morgen et al., *Substance Use and Co-Occurring Psychiatric Disorders Treatment: Systems and Issues for Those in Jail, Prison, and on Parole*, in T. Maschi & G.S. Leibowitz, FORENSIC SOCIAL WORK: PSYCHOSOCIAL AND LEGAL ISSUES ACROSS DIVERSE POPULATIONS AND SETTINGS (2d ed. 2017). Every additional day that Mr. Navedo spends incarcerated is a day that he is not receiving the treatment he needs to overcome his addiction and reduce the risk of recidivism.

Accordingly, consistent with Dr. Mariani's suggestion, as part of any sentence the Court imposes, Mr. Navedo should be placed on supervision with strict conditions that (for at least one year) he participate in inpatient, substance abuse and mental health treatment, and thereafter continue with outpatient treatment and the medication-assisted opioid agonist treatment to which he has shown a positive response.[28] Such Court-mandated treatment would both provide Mr. Navedo with the medical care he clearly needs and would help reduce any risk of relapse or concomitant recidivism. A lengthy term of supervision (with mandated opioid agonist treatment and drug testing) would be no small punishment. As the Second Circuit has noted, "supervised release is itself a serious sanction that imposes significant limitations on a defendant's liberty." *United States v. Brooks*, 889 F.3d 95, 101 (2d Cir. 2018).

Mr. Navedo's own life experiences demonstrate that—when enrolled in comprehensive substance abuse and mental health counseling—he can avoid the relapses that have led to his unlawful conduct. During his most recent enrollment in treatment at Phoenix House, Mr. Navedo was clean, sober, and law-abiding. When he lost that support system and was faced with the hardships of his partner's health problems, he fell into the destructive cycle of drinking, drug use, and illegal conduct. Requiring Mr. Navedo to continue with this support system on an ongoing basis as part of any sentence will help him avoid these pitfalls going forward far better than a lengthy period of incarceration.

---

[28] In particular, Mr. Navedo could be required (if medically indicated) to continue receiving monthly injections of buprenorphine, which Dr. Mariani describes as one of the most effective medical treatments for reducing the risk of relapse by blocking the body's opioid receptors and eliminating the ability to experience any effects from opioids for a month after administration. (Ex. A at 1, 5–9.) As Dr. Mariani notes, data demonstrate that use of medication treatments for opioid disorder (and treatment with buprenorphine in particular) produces dramatically better outcomes than behavioral treatment alone. (*Id.*)

**United States v. Edward Navedo**
**21 Cr. 329 (AT)**

    I.   *The COVID-19 Pandemic Presents Ongoing Risks to Mr. Navedo*

    While the United States is currently in the midst of a decline in the number of COVID-19 deaths (if not cases), as the coronavirus mutates, it presents a continued danger to high-risk individuals like Mr. Navedo, who suffer from comorbities and are confined to unsanitary, congregate settings. *See* A. Petri, "Some Universities and Schools in the U.S. Are Reimposing Indoor Mask Mandates," N.Y. TIMES (May 25, 2022) (noting that "[f]or the first time since February, the country is now averaging more than 100,000 new confirmed cases a day, . . . and the widening use of at-home testing means the true number of infections is probably higher.").[29]

    As the CDC has recognized, persons suffering from depression are more likely to get severely ill from COVID-19. *See* CDC, "Persons with Certain Medical Conditions."[30] This conclusion is consistent with the scientific and academic literature, which has confirmed that "[p]atients with a psychiatric diagnosis had a higher mortality rate compared with those with no psychiatric diagnosis" and "individuals with concurrent psychiatric and medical diagnoses had poorer outcomes and higher mortality." L. Li et al., *Association of a Prior Psychiatric Diagnosis with Mortality Among Hospitalized Patients With Coronavirus Disease 2019 (COVID-19) Infection*, JAMA NETW. OPEN. 2020;3(9):e2023282;[31] *see also* F. Ceban et al., *Association Between Mood Disorders and Risk of COVID-19 Infection, Hospitalization, and Death: A Systematic Review and Meta-analysis*, JAMA PSYCHIATRY, 2021 Oct 1;78(10):1079 (concluding that "individuals with preexisting mood disorders are at higher risk of COVID-19 hospitalization and death and should be categorized as an at-risk group on the basis of a preexisting condition").[32]

    Mr. Navedo has also been diagnosed with asthma, which the CDC has recognized as a particular risk factor that can make someone "more likely to get severely ill from COVID-19." CDC, "Persons with Certain Medical Conditions."[33] *See, e.g., Ferreya v. Decker*, 20 Civ. 3170 (AT), 2020 WL 2612199, at *6 (S.D.N.Y. May 22, 2020) (noting that "CDC guidelines provide that people with asthma, or other respiratory problems are at a heightened risk of severe illness or death from contracting COVID-19").

---

[29]  https://www.nytimes.com/2022/05/25/us/masks-hawaii-delaware.html (last visited May 26, 2022).

[30]  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited May 26, 2022).

[31]  https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2771037 (last visited May 26, 2022).

[32]  https://pubmed.ncbi.nlm.nih.gov/34319365/ (last visited May 26, 2022).

[33]  https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited May 26, 2022).

Given the evolution and spread of the coronavirus—which may infect even vaccinated or previously infected persons like Mr. Navedo—Mr. Navedo runs the continued, elevated risk of catching COVID-19 while in the high-risk setting of congregate prison housing, with severely lacking medical care. The CDC has released a report on the rapid spread of the (less transmissible) Delta variant of COVID-19 among the incarcerated population in federal Bureau of Prisons (BOP) facilities. *See* Hagan LM et al., *Outbreak of SARSCoV-2 B.1.617.2 (Delta) Variant Infections Among Incarcerated Persons in a Federal Prison — Texas, July–August 2021*, MMWR MORB MORTAL WKLY REP. 2021;70:1349 (Sept. 24, 2021).[34] Analyzing one BOP facility in Texas, the CDC reported that a July 2021 outbreak infected 74% of incarcerated individuals in an analyzed housing unit, including 70% of vaccinated detainees. *Id.* at 1349. These detainees were infected notwithstanding not only their vaccination (79% were vaccinated), but also the "[s]tandard COVID-19 prevention protocols that were in place among incarcerated persons includ[ing] mandatory masking in common areas, cohorting of housing units for daily activities, and head-to-toe sleeping arrangements"; the "prompt medical isolation of persons testing positive for SARS-CoV-2 and quarantine of exposed persons testing negative"; "the [e]nvironmental mitigation measures includ[ing] regular disinfection of common areas and high-touch surfaces and provision of individual bottles of disinfectant to incarcerated persons for use in their personal spaces"; and that "[h]ard plastic barriers were installed in visitation areas to prevent physical contact between incarcerated persons and visitors." *Id.*

These data substantiate what this Court has recognized, that inmates in BOP facilities "live in close quarters [where] social distancing is impracticable if not impossible, making it difficult for [them] to protect [themselves] from the spread of this dangerous and highly contagious virus." *United States v. Yu*, 90 Cr. 47 (AT), 2020 WL 6873474, at *4 (S.D.N.Y. Nov. 23, 2020).

These concerns have been borne out in Mr. Navedo's life. Mr. Navedo received two doses of the Moderna vaccine prior to his incarceration in this case, yet still was infected with COVID-19 in the Omicron wave in December 2021 and was subjected to isolation and quarantine for two weeks at MDC Brooklyn. While thankfully Mr. Navedo did not experience life-threatening complications from his COVID diagnoses, his symptoms and the fear they caused him and his family were real. He remains rightfully concerned of the potential long-term damage that might be done as a result of his COVID diagnosis and/or future cases. *See* P. Belluck, "More Than 1 in 5 Adult Covid Survivors in the U.S. May Develop Long Covid, A C.D.C. Study Suggests," N.Y. TIMES (May 26, 2022) (discussing L. Bull-Otterson et al., *Post-COVID Conditions Among Adult COVID-19 Survivors Aged 18–64 and ≥65 Years — United States, March 2020–November 2021*, MMWR MORB MORTAL WKLY REP 2022;71:713–717).[35]

Because no one knows how the COVID-19 pandemic will progress, evolve, or (hopefully) wane, the unique risks it presents to vulnerable, incarcerated individuals like Mr.

---

[34] https://www.cdc.gov/mmwr/volumes/70/wr/pdfs/mm7038e3-H.pdf

[35] https://www.nytimes.com/2022/05/24/health/long-covid-infections.html (last visited May 26, 2022).

<u>United States v. Edward Navedo</u>
**21 Cr. 329 (AT)**

Navedo cannot be understated and should be taken into consideration in the evaluation of any potential sentence in this case, just as this Court has considered these factors in granting compassionate release applications. *E.g.*, *Yu*, 2020 WL 6873474, at \*4 (granting compassionate release to defendant serving life sentence for multiple heroin importation and distribution offenses in light of defendant's "advanced age, medical conditions, and the risk" of COVID-19); *United States v. Valencia*, 15 Cr. 163 (AT), 2020 WL 2319323 (S.D.N.Y. May 11, 2020) (granting compassionate release to defendant serving 10-year mandatory minimum sentence for methamphetamine distribution offenses in light of defendant's medical conditions that placed him at high risk of COVID-19); *United States v. Ramos*, 18 Cr. 852 (AT), 2020 WL 6487198 (S.D.N.Y. Nov. 4, 2020) (granting compassionate release to defendant serving 48-month sentence for firearm and controlled substance offenses given his serious health risk factors).

     J.   *The Harshness of Incarceration During COVID Supports a Downward Variance*

The extreme harshness of Mr. Navedo's incarceration during the pandemic further supports a significant downward variance. Even in "normal" times, courts in this District have acknowledged that "it is no small thing to deprive a person of his or her freedom" because prison "is a harsh environment, in which fear and misery are never far from the surface, boredom is endemic, and privacy is nil." *United States v. Sayoc*, 388 F. Supp. 3d 300, 301 (S.D.N.Y. 2019).

Mr. Navedo's year of detention has been marked by conditions that far exceed the punitiveness of incarceration in "normal" times, caused by understaffing and years of mismanagement at MDC Brooklyn. As Judge Berman has noted, MDC Brooklyn is "dirty," "infested with drugs," and there is a prevalence of "violence." *United States v. Moran*, 19 Cr. 209 (RMB) (S.D.N.Y. May 5, 2020), Dkt. 90, Tr. 12:25–15:21, 37:15–18. Judge McMahon has described the conditions at MDC Brooklyn "as disgusting [and] inhuman as anything I've heard about any Colombian prison, but more so because we're supposed to be better than that." *United States v. Days*, 19 Cr. 619 (CM) (S.D.N.Y. Apr. 29, 2021), Dkt. 35, Tr. 19:17–20.

These already deplorable conditions of confinement have been exacerbated by the BOP's response to the COVID-19 pandemic and multiple security breakdowns during Mr. Navedo's time in custody. During Mr. Navedo's year of detention, MDC Brooklyn has instituted lengthy lockdowns and lock-ins, during which detainees cannot leave their cells for visits, calls, showers, or exercise; are provided cold food; and are unable to access the already limited services in the facility. Such lockdowns have been precipitated both by widespread outbreaks of COVID-19 and security failures resulting in serious injuries to inmates and BOP staff caused by significant staffing shortages and failures.

Earlier this year, Judge Stein issued a notable opinion denying a government request for remand of a defendant following a guilty plea on that grounds that, *inter alia*, the conditions of confinement at MDC Brooklyn constituted "exceptional reasons." *See* Op. & Order, *United States v. Boyd*, 21 Cr. 486 (SHS) (S.D.N.Y. Feb. 3, 2022), Dkt. 74. As Judge Stein recounted: "The MDC, long overcrowded, has recently had an influx of additional detainees due to the closure of the Metropolitan Correctional Center (MCC) and the transfer of the majority of its inmates to the MDC. . . . [It is] dealing with the continuing COVID-19 pandemic and all attorney

**United States v. Edward Navedo**
**21 Cr. 329 (AT)**

and family visits have been suspended," and, "during the past several months," has "been hamstrung by staffing issues, quarantines due to COVID-19, and lockdowns due to security issues." *Id.* For similar reasons, other judges in this District have been "particularly mindful these days of what it means to put a defendant in custody during a pandemic in horrific conditions in the MDC." *United States v. Laboy*, 16 Cr. 669 (PAE) (S.D.N.Y. Dec. 3, 2021), Tr. 42:1–4. Even as the COVID-19 pandemic eases, the trauma of experiencing incarceration in these conditions remains for Mr. Navedo.

As numerous courts in this District have recognized in imposing downward variances at sentencing, we respectfully submit that the Court should take into consideration that the excessively harsh conditions of Mr. Navedo's confinement have made every day he has served more punishing than it should be. *See, e.g.*, *United States v. Phillibert*, 15 Cr. 647 (PAE), 2021 WL 3855894, at *4 (S.D.N.Y. Aug. 27, 2021) ("Long before the current pandemic, courts had recognized that periods of pre-sentence custody spent in unusually arduous conditions merited recognition by courts in measuring a just sentence" (citing, *inter alia*, *United States v. Carty*, 264 F.3d 191, 196–97 (2d Cir. 2001) (holding that that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures," and vacating and remanding the defendant's sentence "so that the district court [could] reconsider the defendant's request for a downward departure"))); *United States v. Gonzalez*, 18 Cr. 669 (JPO) (S.D.N.Y. Apr. 2, 2021), Dkt. 250, Tr. 17:17–18:3 (describing the "extraordinarily harsh" conditions of near-constant lockdowns as "basically like solitary confinement," and noting that "because it's been harsher than a usual period that it's more punitive, that it's essentially the equivalent of either time and a half or two times what would ordinarily be served"); *United States v. Cirino*, 19 Cr. 323 (JSR) (S.D.N.Y. July 17, 2020), Tr. 11:11–15 ("[I]t is fair to say that conditions in the prison system now result in a harshness that is not the norm and that ought to be recognized by the court as a mitigating factor. In effect, you are serving harder time every day you are in the federal prisons."). These concerns militate in favor of a significant downward variance in this case.

## VII.   Conclusion

Edward Navedo stands before the Court deeply remorseful for his conduct. He knows that this is likely the last chance he will get to overcome his addiction and return to a productive, law-abiding life. But with his family's support and a commitment to maximizing whatever opportunities he is given for substance abuse and mental health treatment, Mr. Navedo is resolved to make the most of any mercy he is shown by the Court.

Accordingly, for the reasons set forth above, we respectfully request that the Court sentence Mr. Navedo to a period of no more than 24 months' imprisonment, to be followed by a term of supervised release to include one year of inpatient substance abuse and mental health treatment.[36]

We thank the Court for its consideration.

---

[36]  The Court should not impose any fine given Mr. Navedo's inability to pay any such fine.

**United States v. Edward Navedo**
**21 Cr. 329 (AT)**

Respectfully submitted,

Neil P. Kelly
Assistant Federal Defender
(212) 417-8744

Enclosures

cc:     AUSA Jarrod Schaeffer
        Edward Navedo (Fed. Reg. No. 45944-509)